Good morning everyone and welcome to the Ninth Circuit. We have two matters on calendar today for argument. As I always say when I start calendar, you have your time allotted, but there are no bonus points or extra credit for using all of your time. So, if you have made your points and you're not getting any questions from us, it is okay to sit down. And with that, we'll call up the first case, SEC v. Sripetch. Okay, come on up. I actually got that right? Yes, sir. Oh, good. Okay. Good morning and may it please the court. My name is Tyler Creekmore and I represent the appellant, Ankurok Sripetch. And before I begin, I'd just like to note, if I may, reserve three minutes of my time. You may. Your honors, this case presents you with the opportunity to weigh in on a question that has quite frankly flummoxed and divided several other circuits. And that question is whether the SEC is required to make an affirmative showing of investors' pecuniary harm before a disgorgement order can be awarded in light of the Supreme Court's holding in lieu and the addition of subsection D-7. The appellant suggests that the answer is yes, obviously yes. Given the Second Circuit's rationale in Goebel, we suggest that the absolute answer to that question is they must show pecuniary harm before a disgorgement order can be entered. For its part, the government suggests that the Fifth Circuit and the First Circuit are in favor of a proper approach. And in so doing, I would just note that what really at the bottom of that argument the government is suggesting is that disgorgement should be a default remedy. Simply because they have filed an enforcement action, the disgorgement should be ordered. We urge you not to take that path. So in lieu, the court, of course, spoke about returning disgorge funds to victims. But where did the court tell us that victims have to have been people who suffered a pecuniary loss? Because I don't see that in the decision. Yes. I believe, and I can find it for you and I can provide that site on rebuttal, but there is a site where they discuss what pecuniary harm is. And just the fact that the government has brought a case forward is not good enough to show that it's for investor benefit. I mean, I agree generally. But I mean, they also say, at the very beginning, the court today holds that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for the victim is equitable relief permissible. And they certainly didn't add the caveat or the condition that you're suggesting we add. Yes, Your Honor, they did not. But however, there can be no benefit for the investors if the investors were not harmed. And the harm that they discuss, that we believe that they discuss, and what the global court discusses, is that it's the financial harm that it really comes down to. Appellant does not dispute that there was some harm on investors in this case. But it was a more generalized investment harm that these investors purchased these offerings without full knowledge of Mr. Sirpach's positions. That's the fraud that we're discussing in this case today. The Lew courts, though, they focused on the pecuniary and the investor harm. And they decided that, yes, the SEC, they were called upon, first of all, to answer a question of whether or not disgorgement power even existed for the SEC. They answered that question affirmatively when they reviewed the language in subsection D5. And the statute is 15 U.S.C. 78U. And without having to say that each time, I'm just going to simply refer to the subsection. Very good. So subsection D5 requires the SEC can seek disgorgement or can seek any relief and any equitable relief, I should say, that may be appropriate and necessary for the benefit of the investors. That's the language that the Lew court focused on. But the court also says decisions from this court confirm that a remedy tethered to a wrongdoer's net on lawful profits, whatever the name, has been a mainstay of equity courts. And what the government is seeking, I mean, I understand your argument, but the way the government says we should move forward is certainly consistent with the sentence I just read, is it not? No, Your Honor. It's not tethered to a wrongdoer's net on lawful profits? Respectfully, I think there needs to be more. We can't understand what a wrongful profit is without understanding what the investors lost. And that's where the pecuniary harm comes into play. So they're tethered together almost. The disgorgement can't go beyond net profits after deducting legitimate expenses, and it must be for the benefit of the investors. They're tethered together. And that's how we understand what the net profits are. What the government and the SEC are suggesting is that we can uncouple those two and still have a valid disgorgement order, which we suggest is not proper. If you simply just read the Lew decision, it may come out one way or the other, but there is, and this is where the wrinkle comes in, six months after Lew there was the NDAA passed that added subsection D7, which explicitly gave the SEC disgorgement powers. Now, some may argue, as the Fifth and the First Circuit do, that that has removed the Lew decision and that the government has the power to simply seek disgorgement without the traditional bounds of equity that the Lew court discussed. We think that's a misreading, and we urge you to follow the Second Circuit's rationale behind this. And the reason is simply because this language in D7 was drafted before the court's decision in Lew. So there can be no overturning of the Lew decision when this language was drafted before the decision even was given. So, counsel, I just want to give you a hypothetical so I can better understand your position on this. So let's take your case, your client. Your client admits to committing securities fraud, and there were proceeds from that securities fraud. So the hypothetical would be, let's say the securities fraud in this case was only $1,000. But from that $1,000, he gets $1,000, he goes across the street to a liquor store and buys 10 lottery tickets. And one of them hits Powerball. So from the $1,000, all of a sudden now he has a billion. In terms of your theory for the SEC, could they get just back the $1,000 and he would get to keep the billion? Or would he have to give back the billion? Well, that's certainly not the case that we're discussing. I think what happened here is that Mr. Sripach was ordered to give back what we calculated to be his net profits. And that included the Powerball portion of that, if you will, Your Honor. However, what we're saying is that that is not a correct reading of it. We think that before you can even discuss the Powerball portions, you have to discuss what was the ill-gotten part of that. And to understand that, we have to know how investors were harmed. That's the real So if we can show that an investor spent $1,000, let's say on a stock that was completely bogus. I'm going to make this hypothetical a little clearer. So someone tells me this is Qualcomm stock. It's really not. So I pay $1,000 for 50 shares of Qualcomm stock. It's not Qualcomm stock. Then from that $1,000, they buy the Powerball ticket and get a billion. So I'm the investor. I gave him $1,000 that was worthless. So I should at least get my $1,000 back, correct? We don't dispute that, Your Honor. But what your hypothetical presupposes is that you have identified an investor who has been harmed and an amount in which they've been harmed. That's not this case here. The SEC and the government have had six years now to identify investors and identify how much they've been harmed. And to this day, we don't know one name of those investors or how much they've been harmed. But in my hypothetical, assume we do know the investor. Under your theory of the case, could your client keep the billion dollars from the Powerball? Yes, correct? Perhaps, Your Honor. It depends. It can't be perhaps. Either they can keep it or they can't. I think what we're discussing here is the ill-gotten gains portion of it. That's the other bounds that Lou discussed this year. What we're really focused on is the pecuniary harm. Can the government get a discouragement order without showing pecuniary harm? And in your hypothetical, you've already shown the $1,000 of pecuniary harm. So theoretically, then you could go to the billions and the Powerball. So you think that under your reading of the law, your client would have to give the billion dollars back? Perhaps. Yes, Your Honor. I think the coupling of the two bounds that Lou discusses is the most important part. Once that is done and once the government is held to their burden, then we can calculate what should or should not be discouraged. We don't necessarily have an issue with that in this case. What we're talking about in this case, and the issue for us, is that the government has not shown any investor pecuniary harm. And so because of that, we don't think that there should even have been a discouragement order. So I'm going to ask this to your friend too, but how much is the government holding right now? The discouragement order was... I know what it says, but how much money is there right now that they're holding? I do not know, Your Honor. All right, then I'll ask your friend. So Your Honors, getting back to the NDA language, the subsection D7 explicitly gives the SEC the discouragement power, and also of note, does not include the for the benefit of the investors. And this is where the question has sort of flummoxed other circuits. Does that mean that discouragement is now not an equitable power because D7 is present? That's the position of the Fifth and the First Circuit and what the government is arguing today. We argue opposite because, one, there is no indication that the NDA language D7 was in response to Lew. It was drafted, when you look at the legislative history, before the Lew decision. It was drafted in response to another Supreme Court decision from 2018, the Kokesh case, which called into question whether the SEC even had discouragement powers. It was a reaction to that case, not the Lew case. And if you just look at the explicit language of D7, there's no indication that Congress intended to overturn the Lew decision as well. And because of that, it's essentially become a belt and suspenders provision. It did not remove discouragement from the bounds of equity. It's still there and it is still subject to those playing fields that Lew put in place. And even the SEC in their brief admits that discouragement is still an equitable power. And because of that, the traditional bounds that Lew discussed are in play here. And when you apply all of that to the facts of this case, we believe that the district court erred in ordering Mr. Sirfetch'd any discouragement here. There was no evidence of who was harmed, how much they were harmed, when they purchased any of these securities, and when they sold any of these securities. Without that, we just cannot tell whether or not there was investor harm. And it's that decoupling of investor harm from net profits that is the problem here. So with that, I'll reserve the remainder of my time. Sure. Thank you. Good morning, Your Honor. It may please the court. I'm Carrie Dingell on behalf of the Securities and Exchange Commission. The district court acted within its discretion in ordering discouragement here based on any fair reading of the record and case law. This was a fraud case. Mr. Sirfetch'd made money from fraud. Investors were harmed and the commission intends to disperse any discouragement collected to those victims. Discouragement of Mr. Sirfetch'd's ill-gotten gains is therefore a proper remedy and this court should affirm the judgment. Now, I'd like to start by answering Judge Bennett's question. It's a simple question. Currently, the government holds $1.2 million. About $800,000 of that is from frozen assets from Mr. Sirfetch'd. The remainder is from co-defendants in the case. Now, I think this court can decide this case without reaching any of the admittedly complex questions about discouragement raised in the briefing that arise from recent case law and changes to the statutory authority for discouragement. Mr. Sirfetch'd admitted that he engaged in a fraudulent pump and dump scheme to manipulate the prices of 20 different issuers' stock and then sell them into the market at inflated prices to unsuspecting investors. He admits that he and his co-conspirators made $6 million from their scheme and he admits that his malfeasance caused harm and that investors were duped and tricked by his actions. And in the parallel criminal proceeding, he admitted that his scheme caused investors to suffer financial troubles because they invested their money in empty companies with no future so Sirfetch'd and his partners could buy nice cars and houses. So his only argument on appeal is that he should be permitted to keep more than $2 million of ill-gotten gains simply because the district court did not specify that the harm that it found was financial. Now, such a finding is not required under this court's case law. I think, Judge Thomas, you are exactly right that even under Lew, setting aside the NDAA amendments, pecuniary loss or harm was not a requirement under Lew. Lew makes it very clear that discouragement remains a profits-based remedy intended to deprive the wrongdoer of ill-gotten gains, which is exactly what we're seeking here. So that finding is not required under this court's case law, but even if it were, even if the court were to apply Goebel's holding that pecuniary harm is required, the idea that there's not harm here in a securities fraud case involving multiple pump and dumps defies logic. But counsel, if we were to hypothetically decide that pecuniary harm was required, does that mean that the government would need to show that it was more than $0.01 but wouldn't need to offer any evidence as to how much it was? Yes, Your Honor. I think that's the fairest reading of the Goebel case. Even Goebel says that the purpose of discouragement is to deprive the wrongdoer of ill-gotten gains and not to compensate victims. So even under Goebel, the pecuniary harm is sort of a threshold requirement that Goebel has, the Second Circuit has decided you must show, but it doesn't say that you have to figure out what the amount of that loss was or that discouragement is capped at that amount. Would you agree that the government did not offer an argument or evidence of quantifying particular amounts that any particular investor suffered? That's true, Your Honor. And just a point on that, because the defendant has referenced the Dura matter, which involves damages under private securities law actions, and so I just want to make a point about how damages are different from discouragement. This is a very old distinction in the case law. The Supreme Court in lieu cited an 1888 patent case called Tillman v. Proctor for the proposition that discouragement has to take into account what would be fair compensation to the victim. Now, Mr. Sripich claims that that fair compensation language reading it out of context means that discouragement is then somehow tied to a loss. But that Tillman case makes it very clear, this distinction between damages on one hand and discouragement on the other. It says in an action at law, the plaintiff can recover a verdict only for the actual damage which he has sustained, but upon a bill in equity by the owner against infringers of a patent, the plaintiff is entitled to recover the amount of gains and profits that defendants have made by use of his invention. Now, on the fair compensation point, the court concludes that it's focused on what's fair. It's not focused on compensating the victim for a loss. And it concludes that what's fair is that the infringer is liable for actual, not possible, gains. So what he actually made from using the patent, not what he could have made. So just to kind of go back to the hypothetical I asked before, I'll do it another way. So in like 1982, Bill Gates convinced IBM to allow them to keep the copyright for DOS and they would license DOS to IBM. And then therefore now we have Microsoft and IBM is not what it once was. Let's say when Bill Gates did that, he completely lied to IBM and tricked them into this deal. Just under your theories, does that mean, so they defrauded IBM, they got the rights to DOS and now they're this trillion dollar empire. Under your theory, would IBM be entitled to the trillion dollar empire that was built because it was based on this initial fraud? Not necessarily, your honor, if there were sort of intervening causes of the harm. So one of the things that Lou says is that there has to be a causal connection between the wrongdoing, the violation, and the ill-gotten gain. That's where the net profits idea comes in. That you have to limit it to what the defendant actually made from the violation. And so to the extent that the defendant gets money but then uses it in other ways to make more money, you're talking about a profits on profits scenario. That's not the issue in this case. I mean, the money that Mr. Sherpich made was just money that he took from, he stole really, from investors. But under Judge Owens' hypothetical, if we were looking at it, you'd suggest we would need to look at some variant of proximate cause and attenuation? Yes, your honor, but that's not an issue in this case. I'm just trying to understand what the limits are because I understand what you're saying here but I could, you know, the Supreme Court has, look, I was on the original Ninth Circuit panel in lieu, right? So I mean, I've been down this road before. So the Supreme Court does seem to have some concerns about clawing back large amounts of money when the fraud is relatively smaller. So what, maybe this case is not the case for that. Maybe that's your response. But just, if you could help me get a limiting principle. Yes, I think this case is not the case for it because it's such a clear fraud and the amount that we're seeking is undisputedly the amount that he made from the fraud. He's not, in fact, the district court used his own gain figure from his tax returns and did not use the amount that the commission was seeking. So there's no dispute about that. Lew talks about these various principles. It talks about this principle and the Tillman 1888 patent decision, which I would encourage the court to read because I think it's illuminating, talks about this as well. And then what Lew did was, if you'll recall, Your Honor, listed three limitations that needed to be applied to ensure that the disgorgement remedy satisfied equity. And those three limitations were the net profits limitations. So you have to take legitimate business expenses and make sure you're only seeking profits that are connected to the harm. That's not an issue here. The second was that you're only seeking disgorgement as against that individual for the profits that he made, which limits joint and several liability, which is not an issue here. The commission apportioned out the money that came into the fraud and looked at to which defendant it went. So that's not an issue. And the third was, the court said, generally, equity requires returning the funds collected to known victims. That was a comment on how the money is distributed once it comes in. So disgorgement remains measured by ill-gotten gains. But then, generally, Lew says, the commission needs to distribute. And what it was concerned about, I think, was what it saw as a commission practice of sometimes sending the money to Treasury when there were known victims to whom we could have distributed. That's not an issue in this case because the commission represented to the district court that it will distribute these funds. And there's a declaration in the record. At ER 76, Peter Melle from FINRA describes the blue sheets that we can get from brokerage firms that sort of list out who was investing in these stocks. The commission can use those blue sheets to create a distribution plan, which is the next step. And so, really, all of the Lew limitations are met here. And Lew told us, Lew told courts what they needed, what limitations needed to apply. This pecuniary loss limitation confuses damages with disgorgement and applies a brand new limitation that's not in Lew. I think Your Honor will recall in the Lew remand, the panel looked at these three limitations, applied them to the Lew case without ever saying that pecuniary harm was required. If there are no further questions, we would ask the district court to affirm. Thank you, counsel. Thank you. Briefly, Your Honors, I think what we've discovered here today is essentially that the government agrees that disgorgement is still an equitable principle bounded by the Lew decision. And so, what this case really comes down to is what is the disgorgement that we're talking about? What limitations on that power are there? And what it comes down to is this, is that there can be no calculation, proper calculation of net profits, meaning ill-gotten gains, without understanding how those gains were ill-gotten. Who were they taken from? Without understanding who they were taken from, how much they lost, there can be no disgorgement order. That's what we talk about when we say this coupling between net profits and ill-gotten for the benefit of the investors. That's the key here. The government has failed to couple these two in this case. There has been zero evidence of who's harmed, how much they were harmed by, and where this money will go after it's collected from Mr. Sierpec. The government suggests that they're going to do their best to find these investors and distribute this money, but this has been six years and nobody has been identified. Essentially, what they're asking for is a very low bar in this case. The appellant is not hiding. He pled guilty in the criminal case. He entered into a consent agreement in this case. He is not making it difficult on them, but all we're asking for is to hold the government to its burden before a disgorgement order is entered. And when you look at the facts of this case, there is no evidence of investor harm beyond the fact that they invested without proper knowledge of Mr. Sierpec's positions. There is no information whatsoever about their pecuniary harm, and because of that, the disgorgement order falls apart, and we believe it was an abuse of discretion. So if there's no other questions, I'll stop. Thank you, counsel. Thank you both for your briefing and argument in this very interesting case. This matter is submitted and we'll
judges: OWENS, BENNETT, THOMAS